IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| DAVID E. REED | PLAINTIFF |
| VERSUS | CIVIL ACTION NO.: 2:18-cv-2503-JPM-cgc |
| | JURY TRIAL DEMANDED |
| FEDEX CORPORATE SERVICES, INC. | DEFENDANT |

## SECOND AMENDED COMPLAINT

Plaintiff, DAVID E. REED ("Plaintiff" or "Mr. Reed"), by and through his attorneys, Johnson & Bennett, PLLC, files this complaint and Jury Demand against Defendants, FEDEX Corporation and FEDEX Corporate Services, Inc. ("Defendant" or "FedEx"). This is an action to recover actual and punitive damage for race discrimination pursuant to 42 U.S.C. §1981 ("§1981"), and an action under the Americans with Disabilities Act of 1990 ("ADA") as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et. seq.*, to correct unlawful employment practices on the basis of disability and retaliation for engaging in protected activity under said act, pursuant to 42 U.S.C. § 12117, as well as to correct unlawful employment practices due to violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, 29 U.S.C §541.602, *et seq.*, for unpaid suspension compensation of an exempt employee and related penalties and damages so as to provide relief to David Reed who was adversely affected by such practices.  In support of this cause, the Plaintiff would show unto the Court the following:

1. Jurisdiction of this Court is invoked pursuant to federal question jurisdiction under 28 U.S.C. §§ 1331 and civil rights jurisdiction under 28 U.S.C. §1343, for a cause of action arising under 42 U.S.C. §1981, the Americans with Disabilities Act of 1990 as amended by the ADAAA, 42 U.S.C. §12101 *et. seq.*, and the Fair Labor Standards Act, 29 U.S.C. §201, 29 U.S.C §541.602, *et*

1

*seq*. This Court has authority to award costs and attorney fees pursuant to 42 U.S.C § 1988.

2. Venue is proper in this action pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the Plaintiff's claims occurred in Shelby County, Tennessee, which is within the jurisdiction of the United States District Court for the Western District of Tennessee, Western Division.

3. Plaintiff timely files this action.

4. Plaintiff, David Reed, is an adult resident citizen of Collierville, Shelby County, Tennessee.

5. Defendant, FEDEX CORPORATE SERVICES, INC. ("FEDEX"), is a Delaware Corporation and is an employer within the meaning of the FLSA, §1981, the THRA, TDA and the ADAAA. Defendant's principal place of business is 942 Shady Grove Road South, Memphis, Tennessee 38120-4117. Defendant may be served with process through its registered agent, C T Corporation System, 300 Montvue Rd., Knoxville, TN 37919.

6. Mr. Reed, a white male, was employed by FedEx as a project test lead on or about December 1, 2010, at Defendant's business location at 40 FedEx Parkway, Collierville, Shelby County, Tennessee 38017.

7. Mr. Reed began his employment at FedEx in 2005, but had a break in his employment with the Defendant for a period of time before returning to work for the Defendant in 2010.

8. In all, Mr. Reed was employed by FedEx for approximately thirteen (13) years without complaints or disciplinary problems and had received positive evaluations until a former peer, Andy Pittman ("Pittman"), was moved into a management position over Mr. Reed as Information Technology ("IT") Manager.

9. During his thirteen (13) years of employment, Plaintiff worked for seven (7) managers

and did not have any complaints or disciplinary problems.

10. Mr. Reed has received two (2) FedEx Hall of Fame Awards.

11. Mr. Reed received numerous Bravo Zulu awards given to those FedEx employees who exhibit exemplary performance above and beyond normal job responsibilities.

12. Mr. Reed was a Living PSP Ambassador for FedEx.

13. Mr. Reed experienced increased anxiety and stress after being assigned to projects under Pittman's management.

14. On or after January 11, 2016, Mr. Reed complained to Defendant's Human Resources that he was being subjected to a hostile work environment under the supervision of Andy Pittman.

15. In February 2016, Mr. Reed's previously diagnosed heart condition was impacted by working for Pittman and Plaintiff provided Defendant with work restrictions and accommodations recommended by his treating physicians.

16. Mr. Reed had previously been able to perform the essential duties of his job without any accommodation for his heart condition.

17. Mr. Reed was qualified for and able to perform the essential functions of his job.

18. In the fall of 2016, Mr. Reed asked and was granted permission from the Defendant to put a sign on his cubicle that said, "I stand when the national anthem is played."

19. The sign was in response to the protest by certain NFL players as to the treatment of young black men in the United States' criminal justice system where the NFL players were sitting or kneeling during the national anthem.

20. The sign on Mr. Reed's cubicle had been taken down and he replaced it, once.

21. After he replaced his sign, Mr. Reed was subjected to threats and called a "mother fucking cracker" by racist co-workers.

22. The derogatory language was written on a piece of paper and left on his desk in his cubicle

where he worked at FedEx.

23. Just after Mr. Reed received the racially derogatory note on his desk at FedEx, Mr. Reed was also threatened just outside of the gate of the FedEx parking lot where Mr. Reed parked while at work by four black individuals in a compact car.

24. Because of the racially derogatory note left on Mr. Reed's desk and the fact that the threats made by the individuals in the compact car were within days of each other, Mr. Reed reasonably believed that the individuals in the compact car were FedEx coworkers.

25. Mr. Reed engaged in protected activity by making a race-based workplace violence complaint to the Defendant about the note and the individuals in the car and Defendant directed Mr. Reed to corporate security personnel, Louis Pagano.

26. Andy Pittman was aware of Mr. Reed's race-based workplace violence complaint that was turned over to Defendant's corporate security.

27. Pittman and other FedEx supervisors failed to inform, remind, or retrain their employees that race discrimination and/or a hostile workplace would not be tolerated at FedEx.

28. FedEx failed to protect Mr. Reed from this racist activity.

29. There was no action to remove Mr. Reed from this racial environment.

30. FedEx kept Mr. Reed in a racially hostile work environment which affected the terms and conditions of Mr. Reed's working conditions, a materially adverse work action.

31. FedEx failed to control working conditions to ensure that racist activity was not tolerated.

32. The racist acts and reporting them to Defendant's personnel caused Mr. Reed added stress and anxiety.

33. Mr. Reed was instructed by the Defendant to alter his routes to work and change the times he traveled to and from work. Mr. Reed followed the Defendant's instructions.

34. However, one day when he was driving into work, Mr. Reed noticed the same car that he

had previously encountered by his parking lot at work was following him and the people in the compact car egged Mr. Reed's car.

35. The occupants of the vehicle showed Mr. Reed a black lives matter sign.

36. Mr. Reed thought the black lives matter sign was in response to his sign on his work cubicle that said, "I stand for the national anthem."

37. Mr. Reed, through a bystander, contacted the Collierville police after his car was egged.

38. A Collierville police report was generated in response to Mr. Reed's contact.

39. Soon thereafter, Mr. Reed became more concerned after another threatening incident occurred away from work where a truck pulled up to him and told him something to the effect of, "Don't tell the 'po-po', I know where you and your bitch live."

40. Mr. Reed, highly upset by the idea that someone knew where he and his wife lived, went on to work that day and asked his co-worker, Tom Kelley, what "po-po" meant; and Mr. Kelley said it meant police.

41. Mr. Reed went on to tell Mr. Kelley what had just occurred and due to Mr. Reed's extreme state of panic and anxiety, Mr. Kelley drove Mr. Reed to a minor medical clinic.

42. Mr. Reed was having a panic attack and was administered medicine at the medical clinic to help his anxiety.

43. That same day a Collierville Police detective called Mr. Reed into the police station for an interview.

44. Mr. Reed's wife had to drive him in to the police station because he was unable to drive due to the anxiety he experienced and the medication given to him at the minor medical clinic.

45. The Collierville police officer handling the incident that Mr. Reed reported when his car was egged charged Mr. Reed with filing a false police report despite the fact that Mr. Reed had not committed any such offense and there was nothing to substantiate such a charge.

46. Subsequently, on or about October 27, 2016, Mr. Reed was suspended with pay.

47. On November 4, 2016, the Defendant changed Mr. Reed's suspension to without pay.

48. Since Mr. Reed was suspended without pay, he was required to turn in his work badge and was not permitted to speak to any coworkers.

49. The suspension was improper and humiliating.

50. Mr. Reed's coworkers and supervisors knew of his suspension without pay.

51. Mr. Reed's co-workers later asked Mr. Reed what he did wrong, because Pittman sent out an email to the entire team inquiring if Mr. Reed had contacted any of them during his suspension.

52. Mr. Reed hired an attorney to handle the charge against him and Mr. Reed's charge and arrest were dismissed by the court and expunged, pursuant to Tennessee Code.

53. Expungement of the charge against Mr. Reed should have returned him to the place he was prior to the institution of criminal charges.

54. Mr. Reed was not permitted to return to work until approximately January 4, 2017.

55. FedEx did not want to deal with the race and ADAAA issues Mr. Reed was raising, so the Defendant retaliated against Mr. Reed by unlawfully suspending him without pay, which also violates FLSA.

56. FedEx never provided Mr. Reed any documentation or support that his arrest and charge were job related.

57. After the expungement of his charge, Mr. Reed should have been returned to work as if the charge and arrest never had occurred, including receiving his pay.

58. Plaintiff's suspension even stated the suspension was pending the outcome of the charges.

59. The suspension without pay is in violation of the FLSA, 29 U.S.C. §201, 29 U.S.C §541.602, *et seq*.

60. There is no FedEx Policy that allows for suspensions without pay if a charge against an

employee is not work related.

61. FEDEX's policy provides that an employee is only suspended without pay if the crime they are charged with is "job related."

62. Mr. Reed is an exempt employee.

63. Mr. Reed's suspension did not fall under FedEx's policy.

64. Since the suspension did not fall under FedEx's policy, Mr. Reed should have been suspended with pay.

65. Mr. Reed's charge was based on a matter that happened away from work and after it was expunged, Mr. Reed should have been returned to his position and received his pay as if the charge and arrest never happened.

66. FedEx's employee handbook provides for suspension "with pay" pending the outcome of the criminal charges.

67. There is no provision in FedEx's employee handbook that provides that an exempt employee is suspended without pay pending the outcome of criminal charges.

68. Mr. Reed should have received his wages for the time he was suspended since the charges were dismissed and expunged.

69. Mr. Reed asked to be paid for his suspension since the matter was not only dismissed, but expunged.

70. Mr. Reed believed his expungement should have returned him to where he was prior to the charge being brought against him.

71. Mr. Reed engaged in protected activity when he wrote the Defendant appealing the denial of his pay for the time he was suspended, claiming his pay was unlawfully taken.

72. Mr. Reed did not engage in a criminal act that violated federal or state law.

73. Mr. Reed is therefore owed back wages for the time he was unlawfully suspended.

74. Mr. Reed was denied his back pay by FedEx.

75. Mr. Reed's health insurance benefits had continued during his suspension.

76. Mr. Reed did not receive any justification for denying his back pay.

77. Mr. Reed was told that FedEx did not pay employees who were on unpaid suspension.

78. The suspension without pay was clearly an adverse job action.

79. When Mr. Reed was permitted to return to work on or about January 4 2017, he faced ongoing retaliation, including Pittman criticizing Mr. Reed's work and progress on projects as well as Pittman's defensive comments about the race-based workplace violence complaint and Mr. Reed's suspension.

80. Pittman indicated he did not wish to discuss any of the incidents dealing with racism or the dismissed and expunged charge with Mr. Reed and directed him to report to corporate security, Louis Pagano, upon Mr. Reed's return to work.

81. Mr. Reed did as he was instructed but was subjected to further questions regarding his veracity by Mr. Pagano.

82. There is nothing in Plaintiff's record which would lead FedEx to discount or disregard his truthfulness.

83. The relationship between Plaintiff and his manager, Pittman, became even more contentious after he returned from his suspension due to Pittman's negative comments on Mr. Reed's performance and Pittman's unwillingness to even discuss the incidents at the end of 2016.

84. Mr. Reed never received any closure or information about the outcome of his race-based work place violence complaint, even though he tried to discuss it with Pittman and did discuss it with corporate security.

85. Between February 2016 and October 2017, Mr. Reed requested, numerous times, the reasonable accommodation to be transferred to another manager because of his disability and the need to

be in a less stressful environment.

86. Mr. Reed spoke to various individuals over the time span, including Randy Irving, HR Manager, Brianna in HR, and another lady from HR.

87. Mr. Reed had initially spoken to the supervisor over Pittman, Jimmy Middleton, about transferring and Mr. Middleton had agreed to move Mr. Reed.

88. Middleton was replaced by Sandy Cobb before any transfer could be put into action.

89. Mr. Reed's request for a work reassignment was not for an entirely different position, but rather for a different project assignment that was not under the responsibility or influence of Pittman.

90. Mr. Reed was able to perform the work as he had done for the Defendant since rejoining the Defendant in 2010 without reasonable accommodation.

91. The Defendant did not respond to Mr. Reed's requests for accommodation by inquiring if there were other options available besides transfer to a different manager or project.

92. The Defendant did not communicate with Mr. Reed on whether supervisor Pittman's management style needed to be altered.

93. The stress and anxiety suffered by Mr. Reed while being subjected to racial threats and then being suspended, were not good for his heart condition.

94. After Mr. Reed returned to work in 2017, Mr. Reed's doctors, again, recommended in writing that Mr. Reed be transferred to a different manager.

95. Mr. Reed gave the medical recommendations to the Defendant.

96. Mr. Reed requested a reasonable accommodation to be transferred due to his medical condition to avoid unnecessary stress because of the affect it had on his heart condition.

97. Coworkers, Tom Kelley and Fatima Qadri, both with no known disability, were allowed to change managers without having a position posted and the transfers were approved by their managers.

98. Mr. Reed requested a similar reassignment, just like his coworkers, but his coworkers had

9

not complained about race-based workplace violence nor had they complained about Pittman to Human Resources.

99. Mr. Reed was not allowed to transfer to a different manager in retaliation for his complaints of race-based work place violence and because he repeatedly requested to be moved away from Pittman due to his complaints about Pittman's ongoing criticism of Plaintiff's work and unavailability to be at work to complete projects.

100. Mr. Reed's medical providers' request for a less stressful environment or move to another manager would not be an undue hardship for the Defendant, since other peers of Mr. Reed were allowed to be transferred to different projects under different managers.

101. Mr. Reed's request for a reasonable accommodation was denied, even though another manager in IT had previously indicated that he was willing to allow him to transfer and report to him, which is indicative of it not being an unreasonable request or an undue hardship to the Defendant.

102. Mr. Reed was told that FedEx did not have to transfer him and there was no interactive process pursuant to ADAAA to determine how such a transfer would impose an undue hardship on FedEx or whether Pittman's management style needed alterations.

103. Because Defendant had done nothing to address the recommended accommodations or to determine if other options were available, Mr. Reed's stress levels remained high and he suffered a stroke in February 2017.

104. Mr. Reed's stress affected his heart condition to the extent it resulted in a stroke which could have been avoided had Defendant provided Mr. Reed a workplace free from stress, hostility, race discrimination and workplace threats.

105. Following the stroke, he suffered on or about February 16, 2017, Mr. Reed returned to work around June of 2017, but his doctors continued to be concerned with his levels of stress in conjunction with his heart condition.

106. On or about March 22, 2017, Mr. Reed sent a Speech and Language evaluation to FedEx's management in which many deficits were noted due to the stroke and a request for a reasonable accommodation was made to be transferred to another open position not under Mr. Pittman.

107. The request for reasonable accommodation was denied, again, without engaging in any interactive process.

108. On or about March 24, 2017, Dr. Tyson and Dr. Overby, treating physicians of Mr. Reed, opined that Plaintiff's health issues were related to and exacerbated by ongoing stress caused by FedEx's hostile work environment and requested that Mr. Reed be transferred to a different manager.

109. Again, FedEx denied the request for accommodation with no interactive process.

110. FedEx's policy does allow for a transfer of an employee to a different manager as part of a reasonable accommodation.

111. Even though FedEx's policy allows for an employee to be transferred, Mr. Reed was not allowed this reasonable accommodation.

112. Mr. Reed being reassigned to a vacant position may have been a reasonable accommodation.

113. The Defendant did not look into alternative possibilities to accommodate Mr. Reed.

114. On or about April 10, 2017, FedEx's Human Resources department filed an internal ADA request on Mr. Reed's behalf, to be assigned a new manager.

115. On or about April 20, 2017, Mr. Reed received a letter stating that FedEx was reviewing the complaints and until the reviews were complete, he was to report to Sandy Cobb ("Cobb"), who was Pittman's direct supervisor.

116. After Mr. Reed returned to work in June 2017, Mr. Reed was behind on assignments due to his suspension, which was caused by his race-based workplace violence complaints, and because of his time off for medical treatment following his stroke in February 2017.

117. Mr. Reed was intent on getting caught up on the work he had not been able to do for quite a period of time between his suspension and his medical leave related to his stroke.

118. There was no change in command since Cobb had Pittman do all of the job assignments and evaluations for Mr. Reed.

119. On or about June 1, 2017, Mr. Reed returned to work after the stroke and was still working under the project which was headed by Pittman.

120. On or about July 14, 2017, Mr. Reed met with Sandy Cobb and reviewed his annual performance rating, which had been drafted by Pittman.

121. Mr. Reed told Cobb he did not get credit for his performance on a project as promised and she told him that she could only go by what was written, which verified that Cobb did not write the performance rating.

122. During this same meeting, Mr. Reed begged Cobb to move him in order to honor the promise of her predecessor ' Scott Gillam.

123. Mr. Reed told Cobb, during the same meeting, that he would take a cut in pay and move anywhere in FedEx.

124. The request for an accommodation to be transferred anywhere and take a pay cut was denied.

125. Mr. Reed continued to appeal his negative performance evaluation given by Pittman up the chain of command, but his concerns and policy references were not addressed.

126. Mr. Reed had made complaints to Defendant's management challenging his performance evaluations by Pittman as retaliatory and not in line with FedEx policy that required considering an employee's leave from work.

127. The negative performance evaluation that Pittman wrote for Mr. Reed and that Sandy Cobb said she could not change resulted in Mr. Reed losing out on his bonus for the year; the first time

Mr. Reed did not get a bonus in 14 years with Defendant.

128. Mr. Reed also expressed complaints to Human Resources about the negative evaluation impacting his ability to transfer or apply for different positions because hiring departments could look back on an employee's evaluations and performance for two years.

129. Mr. Reed felt that the negative performance did not consider the 177 days he missed due to the suspension and his medical leave and was further retaliation for his complaints of being in a hostile environment under Pittman and that Defendant's policy allowed for leave to be considered in the evaluation process.

130. No matter how much evidence Mr. Reed presented to management and HR, nothing was done about his negative evaluation.

131. The negative performance evaluation written by Pittman and approved by Cobb caused further stress and anxiety for Mr. Reed and was an adverse job action that impacted his bonus and his ability to move within the company.

132. On or about July 17, 2017, Mr. Reed's treating Primary Care Physician and Nurse Practitioner sent a follow-up letter again requesting that Mr. Reed be assigned to a new manager and a different project in order to reduce stress.

133. FedEx did not respond or take any action to accommodate Mr. Reed.

134. On or about July 6, 2017, Mr. Reed's cardiologist sent a letter to management and Human Resources for him to avoid undue stress at work.

135. There was no known response by FedEx.

136. On or about August 3, 2017, Mr. Reed treated with his cardiologist for repeated Atrial Fibrillation episodes and was told to avoid stressful triggers. Mr. Reed passed along this information to management and HR.

137. Mr. Reed's cardiologist also recommended a surgical procedure to reduce the possibility

of future strokes due to the continued stress and anxiety Mr. Reed was dealing with the goal of allowing Mr. Reed to adjust his medications for his heart condition.

138. Mr. Reed once again forwarded the medical accommodations requests to the Defendant.

139. The Defendant once again did not engage in the interactive process with the Plaintiff, to see what could be done to assist in his accommodation.

140. Mr. Reed was on medical leave for his heart surgery during September 2017 and returned to work on October 4, 2017.

141. On or about September 22, 2017, Mr. Reed underwent an atrial fibrillation ablation.

142. On or about October 4, 2017, after Mr. Reed returned to work following his heart ablation, Mr. Reed was called to the office with managers Sandy Cobb and Andy Pittman.

143. The mere presence of Pittman confirmed what Mr. Reed already knew, that Pittman retained a supervisory roll over Mr. Reed.

144. During this meeting, Mr. Reed asked about a presentation that Pittman wanted completed, but Cobb and Pittman did not grant Mr. Reed system access to perform his work, which resulted in further stress and anxiety for Mr. Reed.

145. During the October 4th meeting, neither manager asked how he was doing medically, but told Mr. Reed to return once he was cleared by his medical doctor.

146. During the same meeting, Mr. Reed asked why a female coworker, Fatima Qadri, was allowed to be transferred to another project but he was not allowed to change projects.

147. Mr. Reed was told to shut up and worry about himself.

148. Mr. Reed felt, in that moment, during the meeting with Pittman and Cobb, that he was about to pass out.

149. Following the meeting on or about, October 4, 2017, Mr. Reed left work due to severe anxiety, stress, and the blackout sensations he was experiencing and went to see his cardiologist.

150. Mr. Reed shared with his doctor that he still reported to Andy Pittman and what had gone on in the meeting with Pittman and Cobb.

151. Mr. Reed struggled with reporting to Pittman despite the numerous complaints he had initiated involving Mr. Pittman, including the race issue, the accommodation requests, and challenged evaluation.

152. Mr. Reed was advised by his treating physicians and providers that working under such stress and in a hostile environment were detrimental to his health.

153. Mr. Reed again took medical leave in late October 2017.

154. Mr. Reed has not returned to work, but received short term disability benefits for approximately six months.

155. Mr. Reed is now receiving long term disability benefits, including an annual bonus.

156. Mr. Reed believes his stroke and ensuing decline in his health are directly related to his continuing to work in a hostile environment under the management of Andy Pittman and Sandy Cobb and ultimately FedEx's denial of a reasonable accommodation and failure to protect him after he undertook protected activity in reporting the threats and racially derogatory note.

157. Mr. Reed's medical providers had already provided documentation that the hostile work environment exacerbated Mr. Reed's atrial fibrillation which can lead to strokes.

158. Because Defendant would not discuss options for addressing the need to accommodate Mr. Reed's medical condition with a stress-free environment, Mr. Reed was not able to return to work.

159. FedEx did not engage Mr. Reed in the interactive process to accommodate him for his physical disability.

160. FedEx retaliated against Mr. Reed by placing him on suspension for filing racial discrimination complaints and for seeking medical accommodations.

161. FedEx did not take the actions against Mr. Reed for his alleged filing of a false police

report, a matter that was expunged and should not have been considered by FedEx.

162. The Defendant should have applied the law regarding expunged offenses and put Mr. Reed back in the same position as if the charge had never been instituted.

163. Plaintiff filed a Charge of Discrimination (COD 490-2018-01062) ("COD") with the United States Equal Employment Opportunities Commission ("EEOC") on April 25, 2018, alleging violations of the ADAAA. (*See* Exhibit "A".)

164. Continued refusal to consider some accommodation for Mr. Reed to relieve the amount of stress he was suffering dealing with Pittman and Cobb was close in proximity to Mr. Reed filing his COD and was retaliation for filing the COD, in violation of the ADAAA.

165. Continuing to keep Mr. Reed in his position under Pittman after Mr. Reed had reported race-based derogatory discrimination because of his sign being removed and then the note calling him a "mother fucking cracker" being left on his desk is in violation of 42 U.S.C. § 1981's protections to be free from a race-based hostile work environment.

166. The Defendants suspension of Mr. Reed without pay was in retaliation for his complaints of race-based discrimination and workplace violence and in violation of the protections to be free from race discrimination and a racially hostile work environment under 42 U.S.C. § 1981.

167. Pittman and Cobb's negative performance evaluation in July 2017 was in retaliation for Mr. Reed's race-based discrimination and workplace violence complaints that led to his suspension and stroke, causing him to miss approximately 177 days of work that was not considered in giving him the negative evaluation in violation of 42 U.S.C. § 1981's anti-retaliatory provisions.

168. The Defendant's suspension was also in retaliation for Mr. Reed's complaints about Pittman and the hostile work environment created by Pittman which prompted Mr. Reed to request an accommodation due to the impact on his heart condition, in violation of the protections afforded Mr. Redd under the ADAAA.

169. Defendant's refusal to address Mr. Reed's requests for accommodation, including but not limited to, a transfer to a different manager, to be moved to a different project not under Pittman, to be provided a stress free work environment, and to have reduced stress at work is in violation of the ADAAA's requirement that the parties engage in the interactive process to ascertain whether there is an accommodation that can be provided that does not cause an undue burden on the Defendant.

170. The Defendant did not even open an ADA claim for Mr. Reed until after he suffered his stroke and his doctors indicated that the environment Mr. Reed was in at work likely contributed to his stroke.

171. The negative performance evaluation that Pittman gave to Mr. Reed through Sandy Cobb was in retaliation for Mr. Reed's requests for accommodation and to be moved to a different manager, something that other coworkers were able to achieve with no problems, all in violation of the ADAAA's anti-retaliation provisions.

172. The refusal to give Mr. Reed access to Defendant's system to perform work on a project assigned to him by Pittman and Cobb in October 2017 were in retaliation for Mr. Reed's complaints of race-based discrimination and workplace violence and for his requests for accommodation, all in violation of 42 U.S.C. § 1981 and the ADAAA.

173. Suspending Mr. Reed without pay for alleged charges unrelated to work and not putting him back in the position he would have been had no criminal charges been brought as a result of the expungement is in violation of the FLSA.

174. The FLSA provides for handling the suspension of exempt employees without pay and does not permit such action if the alleged charges are unrelated to work.

175. The effect of suspension without pay of an exempt employee under the FLSA can affect the employee's exempt status.

176. Any potential harm to Mr. Reed under the FLSA due to his suspension without pay could

have been easily remedied by paying Mr. Reed his back pay for the time he was suspended, thus making Defendant's violation of Mr. Reed's rights under the FLSA willful.

177. The suspension, even if Defendant had paid Mr. Reed for his back pay, was still an adverse action because it affected his life and the income received by him and his family, all at the end of the year.

178. The unlawful employment practices complained of herein were done with malice and/or with reckless indifference to the federally protected rights of Mr. Reed.

179. The EEOC issued a Notice of Suit Rights in response to Plaintiff's Charge of Discrimination 490-2018-01062 on May 1, 2018.  (*See* Exhibit "B".)

180. Plaintiff suffered loss of pecuniary interest due to the actions of the Defendant in discriminating and retaliating against him.

181. Plaintiff has suffered mental anxiety and stress, inconvenience, loss of enjoyment of life, loss of income and valuable benefits as a result of the Defendants' actions.

182. Defendant's violations of Plaintiff's statutory rights under §1981, the FLSA, and the ADAAA were intentional and willful and done in direct disregard for Plaintiff's right to be free from retaliation for protected activity.

183. Defendant's violation of Plaintiff's federally protected rights was done with malice or reckless indifference to Plaintiff's federally protected rights so that Defendant is liable for punitive damages under 42 U.S.C. § 1981 and the ADAAA.

184. Defendant's violation of Plaintiff's federally protected rights was done with malice or reckless indifference to Plaintiff's federally protected rights so that Defendant is liable for liquidated and treble damages under the FLSA.

185. Plaintiff sustained substantial monetary and non-monetary damages as a result of Defendant's illegal conduct, including loss of pay while suspended, exacerbation of his heart condition,

suffering a stroke, reduction of his income due to being on disability rather than working and other tangible and intangible damages. Mr. Reed demands such legal and equitable relief as will effectuate the purposes of §1981, the FLSA, and the ADAAA, including but not limited to, the following:

a. Accrual of back pay, front pay and fringe benefits;

b. Compensatory damages;

c. Liquidated damages;

d. Punitive damages;

e. Pay during the time of his suspension;

f. Loss of enjoyment of life;

g. Costs and attorney fees;

h. Appropriate affirmative action;

i. Correction of the employee record and removal of the suspension;

j. Any other relief that this Court deems just and equitable.

Plaintiff prays for damages in an amount to be determined by a jury, for removal of the suspension from his employee record, and for reasonable attorney fees.

Respectfully submitted,
David E. Reed

BY: */s/ Kristy L. Bennett*
Tressa V. Johnson BPR #26401
Kristy L. Bennett BPR #30016
Johnson & Bennett, PLLC
1331 Union Avenue, Suite 1226
Memphis, Tennessee 38104
Telephone: (901) 462-6830
Facsimile: (901) 462-8629
kristy@myjbfirm.com
tressa@myjbfirm.com

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing has been filed with the Clerk of the United States District Court for the Western District of Tennessee using the CM/ECF system. The Court's CM/ECF system will send an email notification of the foregoing filing to the following parties and counsel of record who are registered with the Court's CM/ECF system.

Brian K. Coleman, Esq.
Barak J. Babcock, Esq.
Federal Express Corporation
3620 Hacks Cross Road
Building B – 3rd Floor
Memphis, TN 38125
(901) 434-8574
(901) 434-9278 fax
  *Attorneys for Defendant*

THIS the 17th day of October, 2018.

    s/ Kristy L. Bennett
    Kristy L. Bennett